Plaintiff instituted this suit under the Workmen's Compensation Act (No. 20 of 1914, as amended) seeking to recover 65% of his weekly wages for a period not to exceed 400 weeks. He contends that he is totally and permanently disabled from performing any work of a reasonable character due to an injury he received in an accident arising in the course and scope of his employment.
Defendant admits the occurrence of the act and that plaintiff was injured and that the case falls under the Workmen's Compensation Act, but denies that the plaintiff was disabled for more than ten weeks, the period for which it paid compensation.
The lower court rejected plaintiff's demands and he is prosecuting this appeal.
The admitted facts of the case are that plaintiff was receiving a weekly pay of $12 per week and if he is entitled to compensation it should be at the rate of $7.80 per week; that he was injured by an accident arising out of and in the course and scope of his employment; that the doctor and hospital bills incurred during the ten-week period following the accident were paid by defendant and that plaintiff was paid $78, or ten weeks' compensation. *Page 622 
Defendant is a wholesale packing company. In the cellar or storage room of said plant are located the machinery and freezing unit in the operation of which ammonia is used. Underneath the cellar floor there is a sump tank approximately four feet in diameter and seven or eight feet deep, the top of which is flush with the cellar floor. The top is covered with a steel cover on which sits a pump that extends down into the tank and has a motor on top which automatically operates the pump when the fluid in the tank reaches a certain stage and pumps the fluid through a pipe into the sewer. The pipe leading to the sewer has a gate valve, or butterfly valve, which prevents the sewer water from coming back into the tank.
The tank is used as a drainage tank for the purpose of collecting the water and grease on the floor, or whatever one might get in washing the floor, and for the purpose of collecting that water before it gets to the sewer. The meat and other produce stored in the packing plant causes much grease and other substance to collect on the floor and requires that the floor be scrubbed with some kind of washing powder to cleanse it. All of this goes into the tank and is finally pumped from the tank to the sewer. If any ammonia used in the freezing unit should get on the floor it of course would be washed into the tank and if any substance or object should prevent the tight closing of the butterfly valve in the pipe leading to the sewer, there would be nothing to prevent the gas from the sewer coming into the tank.
On October 9, 1941, plaintiff and another employee who had been assisting the traveling mechanic of defendant corporation in overhauling and putting in shape the refrigerators, elevators and all other mechanical equipment in the plant, were ordered to bail out the sump tank. The process used was a bucket attached to a rope. The sliding opening in the cover or top of the tank through which one could enter the tank was approximately one-third the size of the cover. There was a ladder set on the bottom of the tank extending to the top opening. Plaintiff entered the tank and was standing on the ladder where he could dip the bucket in the fluid and his fellow employee would then hoist the bucket by the rope and empty it into a barrel which had been provided for that purpose.
Plaintiff was a small man and while performing this work his head was below the top of the tank. He began this particular job soon after one P.M., and after approximately fifteen minutes his fellow laborer called to him to come on with the bucket. Receiving no reply he looked to see what was the matter and discovered plaintiff still standing erect on the ladder with one hand grasping it, his body perfectly stiff and, as he said, — "He had a peculiar look on his face". Help was called for by the employee who discovered plaintiff's condition and he was pulled out of the tank and placed on the floor on some sacks. Plaintiff was perfectly stiff and unconscious. At approximately one-thirty P.M. the Manager of the plant returned from lunch and suggested that artificial respiration be given plaintiff and at the same time had an ambulance called. The artificial respiration was successful in starting plaintiff to breathe again and soon thereafter he was raised to his feet again but could not stand. He was carried to the outside where he sat until an ambulance came. Just how long a period of time elapsed before the ambulance came is not shown and plaintiff was carried to the sanitarium. The record does not show at what hour he entered the sanitarium.
Plaintiff testified he did not regain consciousness until he was entering the sanitarium. Some of the defense witnesses say he was conscious before he left for the sanitarium and other witnesses say he had limbered up some before he left for the sanitarium. There is no evidence of anything plaintiff said before leaving for the sanitarium that would indicate he had fully regained consciousness. He remained in the hospital for seven days under the treatment of a physician chosen and paid for by defendant and was then sent home. When plaintiff was conscious at the sanitarium he complained of dizziness and severe pains in his chest, stomach and between his shoulder blades. He states that when he coughs a severe pain strikes him and cuts his breath off. He has continuously complained of these pains since leaving the hospital and at the time of trial his cough had grown much worse — this was four months and sixteen days after the accident. It is certain that plaintiff has not performed any labor of any kind since the accident and claims he is not physically able to do so. He has been confined to his bed on several occasions and called in physicians to give him something to ease his pain. Plaintiff walks from his home to *Page 623 
the business section when necessary but always using a stick or cane. A number of his neighbors and friends testified that plaintiff was unable to do any kind of work and several of them testified that they had gone to his home, cut wood and made fires for him to keep warm because he was unable to do so for himself. Plaintiff's only means of livelihood was the help of his mother with whom he lived and small amounts of money his friends either gave him or loaned him. His mother testified that he did not sleep well at night and often would get up and come into her room complaining of severe pain.
Only one witness claims to have ever seen plaintiff away from home after nightfall since the accident and he was a negro who was paid by defendant to watch plaintiff for the purpose of testifying in the case. He was most exact in his testimony, giving the exact hour and minute where he saw plaintiff, what he was doing and those he was with, but did not produce anyone to corroborate his testimony. Such testimony would be dangerous indeed to consider in attempting to render justice in any case.
Plaintiff either has been totally disabled since the accident or he is the most astute malingerer that has ever appeared before this court. The evidence would not justify us in finding him to be a malingerer. The record shows that he is approximately forty years of age and has worked fairly regular all his life. We are convinced plaintiff is totally disabled and the only question now is, — Was the accident the cause of his disability?
Defendant does not contend there was any other cause for disability but stands on the theory that plaintiff is not disabled and has not been since ten weeks after the accident. This being true, we could easily end our opinion here but prefer to discuss to some extent the cause of the accident and the conflicting medical testimony.
Plaintiff alleged the accident was caused by inhaling ammonia gas. Defendant in answer alleged the cause of the accident was the inhaling of sewer gas. Defendant's manager testified the accident was caused by some kind of gas but he did not know what kind. In this court defendant contends the accident was caused by a lack of sufficient oxygen and is supported by the doctor it employed to treat plaintiff at the sanitarium.
The medical testimony is not very enlightening as to the effect of poisoning by sewer gas or ammonia gas and even defendant's doctors do not agree in this respect. One of them testified it affects the mucous membrane at any place in the body and another said it only affects the blood and not the mucous membrane. They all agree that if plaintiff's trouble had been lack of sufficient oxygen he would have recovered within a few minutes after reaching fresh air. None of the doctors testified that plaintiff could have become unconscious from lack of oxygen and remained erect and stiff. The only one who testified on this point said it was improbable. The physician who testified for plaintiff was certain that if the air were sufficiently charged with enough sewer gas to knock a man out suddenly as was plaintiff, the sudden contraction of the hand on the ladder would have supported him. We are convinced that the accident was caused by the presence of sewer gas or a gas of similar power.
The doctor who treated plaintiff never treated him for poison gas. He considered him a malingerer from the first and never looked for any real trouble. He says he treated him for a latent case of syphilis and a slight case of malaria, both of which plaintiff had suffered with for years. The physician gave no reason for thinking plaintiff a malingerer and his testimony was most antagonistic to plaintiff at all times. He was positive that plaintiff did not suffer from gas poisoning and gave as his only reason that he had looked at the sump tank but did not say when.
Taken as a whole the medical testimony is very unsatisfactory and the most positive testimony is that of the doctor who testified in plaintiff's behalf. He was of the opinion that plaintiff's trouble was caused by either sewer or ammonia gas and that one affected as seriously at the time as plaintiff was might easily suffer disability for a long time and that sometimes it would cause death; that either of the causes would have affected the mucous membrane anywhere in the body it came in contact with and could well account for the pain in the stomach, chest and back from which plaintiff claims to suffer. All examinations made of plaintiff by defendant's doctors showed, according to their testimony, at least a slight bronchial trouble and the X-ray picture taken by defendant showed a slight curvature of the spine in the region *Page 624 
where plaintiff complained of pain. One of defendant's doctors testified that poison gas could cause a curvature of the spine.
At one time we considered remanding the case for further and more definite testimony on the effect of sewer gas or ammonia gas on the human system but since we are convinced that plaintiff is totally disabled and the only defense is that he is a malingerer and is able to work, we have changed our mind and will now determine the case.
The judgment of the lower court is erroneous and is reversed and there is now judgment for plaintiff and against defendant in the sum of $7.80 per week for a period not to exceed 400 weeks, beginning October 9, 1941, with legal interest on each weekly payment from due date until paid, less $78 previously paid by defendant; all costs of both courts to be paid by the defendant.